FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

98 MAR -3 PM 2:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

OTTIE R. NOBLE,                )
                               )
        Plaintiff,             )
                               )
vs.                            )   Civil Action No. CV97-S-2493-M
                               )
UNITED STATES OF AMERICA,      )
                               )   ENTERED
        Defendant.             )
                                   MAR 0 3 1998

## MEMORANDUM OPINION

Ottie R. Noble was employed by the United States Bureau of
Prisons as a painter supervisor at the Federal Correctional
Facility in Talledega, Alabama. He injured his back during self-
defense training on January 27, 1994. Noble advised the
correctional facility safety director of his back injury on January
31, 1994:

> After taking the self defense course during annual
> refresher training on January 27, 1994, I have
> experienced a pain in my neck and numbness in my right
> arm. I have made an appointment with my family doctor on
> this matter. This memo is to inform you of my injury in
> the event that I need assistance from the Safety Office
> of Worker's Compensation.

(Plaintiff's exhibit 9.) That informal notice was followed by a
formal "Claim for Continuing Compensation on Account of Disability"
filed with the United States Department of Labor, Office of
Workers' Compensation Programs ("OWCP"), on June 18, 1994.
(Plaintiff's exhibit 10.) Thereafter, Noble's treatment and
receipt of FECA benefits were managed by OWCP claims examiners,
whose duty it was to

adjudicate claims; authorize benefits and set up compensation payments; manage individual cases, so that timely and proper actions are taken in each claim; and manage a caseload, so that all cases are handled promptly and effectively.

(Plaintiff's exhibit 4 (FECA Procedure Manual) at 5.)

Noble claims that the OWCP failed to adequately process his claims for treatment under the Federal Employees' Compensation Act, and that such failure to process his claim in a timely manner aggravated his injury. He commenced this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-80, seeking damages for "the failure of the defendant to timely and appropriately process the claim for medical care and treatment," and for "negligent and/or willful failure of the defendant to properly and adequately access [sic] the plaintiff's medical condition and approve the surgeries recommended by the authorized physicians ...." (Complaint at 8.)

The United States filed a motion to dismiss on December 4, 1997, arguing this court lacked subject matter jurisdiction, and Noble's complaint failed to state a claim upon which relief could be granted. This court informed the parties of its intention to treat the government's motion as one for summary judgment. (See submission order entered December 9, 1997 (Doc. No. 13).) Noble filed an "Amendment to Complaint" on January 2, 1998, adding three new theories of action: (1) the tort of outrage; (2) "intentional interference in the employee/physician relationship"; and (3)

2

failure to exercise "keen judgment" in claims processing.   The United States moved to dismiss the amendment on January 12, 1998.[1] Upon consideration of the pleadings, briefs,[2] and evidentiary submissions, this court concludes defendant's motions are due to be held in abeyance, pending resolution of matters discussed *infra*.

## I.  FACTS

### A.   Initial Evaluation

Noble initially was examined by Dr. James G. White, III, a neurosurgeon, on February 14, 1994.  (Plaintiff's exhibit 2-C at 23.)   Dr. White made no findings, but noted that plaintiff complained of neck and arm pain that had diminished after the accident.

> 2/14/94: Initial Visit.  Very nice 46 year old gentleman who injured himself during a prison training drill with some other prison guards.  He works at the Talladega Prison.  He had neck and right arm pain.  The right arm pain has now completely subsided.  He has only occasional ache in his neck for which he is not really having to take medication at this point.  Neurologically, he is intact.  I have documented that he had this injury if it recurs.  There is no charge for today's visit.

(*Id.*)  Noble returned to Dr. White on May 9, 1994, complaining of persistent neck and right arm pain.

---

[1] The United States simultaneously filed motions to strike those portions of the amended complaint seeking equitable relief, prejudgment interest, and attorneys' fees.  Those motions will be held in abeyance pending resolution of the issues discussed *infra*.

[2] The United States filed a "motion for leave to file additional argument in support of its motion to dismiss amendment to complaint" on January 26, 1998.  That motion will be held in abeyance pending resolution of the issues discussed *infra*.

3

> Return visit. He is now having persistent neck and right
> arm pain. This is a bit worse than it was. He does wish
> to have this tested.   I can find no objective motor,
> reflex or sensory deficit. He will need a cervical MRI.
> This will be arranged and I will see him back next week.

(*Id.* at 21.)   Dr. White scheduled a cervical myelogram, which was
performed on May 18, 1994.   (*Id.* at 19.)   That diagnostic procedure
revealed "extradural defects at the C4-5 level on the right, and at
the C6-7 level on the left."   (*Id.*)[3]   Consequently, Noble was
advised by Dr. White on June 6, 1994 to have a "surgical cervical
intervention."

> 06/06/94:   Return visit.   He did have an abnormal
> myelogram and was advised to have a surgical cervical
> intervention. His insurance is [sic] company is the U.S.
> Department of Labor and there is some delay in evaluation
> for approval through this government agency.   He is
> hurting quite severely and wishes to have surgery.   Once
> again, we will attempt to schedule this.

(*Id.* at 18.)     Dr. White submitted an "Attending Physician's
Supplemental Report" to the OWCP on June 23, 1994, diagnosing Noble
as suffering from "Cervical strain" and "Cervical HNP," and
recommending surgery. (*Id.* at 16.)

---

[3]These results should be compared to the June 7, 1994 report of Dr. Homer
A. Spencer, a radiologist employed at Gadsden Regional Medical Center, who
interpreted the May 18, 1994 cervical myelogram performed by Dr. White:
plaintiff's exhibit 2-C at 20, stating in relevant part:

> On today's examination, extradural defects were present at C4 on the
> right and C6 on the left.   Cross table lateral views show mild
> osteoarthritic changes at C5.   The remainder of the examination was
> unremarkable.

> Impression; (1.)   Extradural defect, C4, right.
>             (2.)   Concurrent extradural defect, C6, left.
>             (3.)   Mild degenerative disease, C5.   HAS/jsm

4

James W. Campbell, facility manager for the Talledega Federal
Correctional Institution, presented Noble with a questionnaire on
June 15, 1994, seeking medical substantiation of his condition for
the purpose of facilitating payment of sick leave benefits.  (*Id.*
at 14-15.)   Dr. White responded to the questionnaire on Noble's
behalf on July 5, 1994, by handwriting a response to questions one
through three in the margins (*id.* at 12), and, typing his responses
to questions four through eight on a separate sheet of paper.  (*Id.*
at 13.)   The following represents an amalgamation of the
questionnaire and Dr. White's handwritten and typewritten
responses.

1.   Assessment of the current clinical status and plans for
     your future treatment

     A:   Surgery

2.   Diagnosis

     A:   Cervical HNP

3.   An estimate of the expected date of a full or partial
     recovery

     A:   3-6 months from day of surgery

4.   An explanation of the impact of the medical condition on
     life activities both on and off the job

     A:   The injury that this gentleman has
          suffered has impacted his life activities
          both on and off the job due to the
          severity of the pain.  This limits him
          quite severely in his activities without
          surgical intervention.

5

5.  A narrative explanation of the medical basis for any
    conclusion that the medical condition has or has not
    become status or well stabilized

    A:  I do not feel that the medical condition
        has become stabilized.  He has probable
        herniated disc at C4 and possible at C6.

6.  A narrative explanation of the medical basis or any
    conclusion which indicate the likelihood that you are, or
    are not, expected to experience sudden or subtle
    incapacitation as a result of the medical condition

    A:  This is the sort of situation where with
        a sudden worsening of the condition,
        either by further injury or even
        spontaneously, a person could experience
        paralysis.

7.  A narrative explanation of the medical basis for any
    conclusion that duty restrictions or accommodation are,
    or are not, warranted, and if they are, an explanation of
    their therapeutic or risk-avoiding value and the nature
    of any similar restrictions or accommodations recommended
    for non-work-related activities

    A:  This gentleman basically needs a surgical
        intervention and at best, if he continues
        to work should have lifting restrictions.
        I would suggest no more than 20 pound
        lifting until the condition was
        surgically corrected.

8.  A narrative explanation of the medical basis for any
    conclusion which indicates the likelihood that you are,
    or are not, expected to suffer injury or harm my [sic]
    carrying out, with or without, accommodation, the tasks
    and duties of your position

    A:  I feel that it is fairly likely that he
        could suffer further harm or neurologic
        damage if his condition goes uncorrected.

(See id. at 12-13 (emphasis supplied).)

6

**B.  Second Opinion**

The OWCP notified Noble on June 21, 1994, that it had scheduled an appointment for him to be examined by an orthopaedic surgeon, Dr. Matthew Berchuck, on July 12, 1994, for "a second opinion regarding your request for authorization of surgery." (Plaintiff's exhibit 1-W.)  The OWCP also requested on July 1, 1994, "medical evidence establishing [Noble's] disability for work during the entire period claimed." (Plaintiff's exhibit 1-V.)

Dr. Berchuck examined Noble, and reviewed copies of medical records brought by him to the examination, on July 12, 1994. (Plaintiff's exhibit 2-A at 3.)  Dr. Berchuck believed Noble's prior myelogram was "basically unreadable"[4] and, accordingly, recommended

> a repeat myelogram and CT to precisely define the pathology.  I would also recommend electrodiagnostic studies of the upper extremity to rule out a significant component of carpal tunnel syndrome.  If these studies were positive for neurocompression at the level of the neck, I think he would be a candidate for a decompression procedure.  However, I think additional information is needed at this time.

(Id. (emphasis supplied).)  (Dr. Berchuck did not subsequently examine plaintiff, and there is no explanation in the record for his failure to do so.)

---

[4]  The patient has brought with him some studies, these include xrays of the cervical [sic] spine taken 2/1/94 which were negative.  Myelogram of the cervical spine 5/18/94 shows evidence for right C5 nerve root cut-off. Postmyelogram CT, there is a poor dye concentration and I think this study is basically unreadable.  He has not had an MRI or any electrodiagnostic studies.

(Plaintiff's exhibit 2-A at 3 (emphasis in original).)

7

1.   **Submission of additional information by Dr. White**

Dr. White submitted a second "Attending Physician's Supplemental Report" to the OWCP on September 22, 1994. (Plaintiff's exhibit 2-C at 10.)   While that report again recommends surgery, it is based on Dr. White's previous examination of June 6, 1994.

Dr. White again examined Noble on January 25, 1995. (*Id.* at 9.)   He found weakness in the triceps and deltoid muscles of plaintiff's right arm, and recorded the following in his office notes:

> 01/25/95: Return visit. He is still hurting severely. He had an abnormal myelogram back in the summer which revealed two extradural defects at C4 and C6. He was advised to have an anterior cervical discectomy and fusion. He is now having more right arm radicular pain. He has now developed a triceps weakness of 4/5 on the right as well as a deltoid weakness at 4/5 on the right. I will state for the record that I do not consider myself to be responsible for the increasing neurologic deficit due to the delay by the U.S. Department of Labor, at least according to the patient. I do feel now due to progressive deficit that he would need a cervical myelogram repeated as his tests are quite old, over half a year old, before making surgical decision. Once again I recommend this.

(*Id.*)   Dr. White thus performed a second myelogram on January 30, 1995, and recorded the following:

> Posterior vertebral spurring is noted at the C4-5 disc space level which produces a small anterior epidural defect on the contrast filled suberachnoid space.
>
> At the C5-6 disc space level and the C6-7 disc space level anterior epidural defects are present.   With comparison to the previous study of 5/18/94 similar findings are present.

8

IMPRESSION:
1.   No significant interval change from the comparison myelogram dated 5/18/94.

2.   Mild degenerative changes.

3.   Anterior epidural defects at C5-6 and to a lesser extent C6-7 disc space levels.   RLB/mcj

(*Id.* at 8.)

C.   **Third Opinion**

On the same day that Dr. White performed a second myelogram (January 30, 1995), Noble received from the OWCP notice that yet another appointment had been scheduled for still another "opinion regarding your request for authorization of surgery," this time by orthopaedic surgeon Dr. Richard Rex Harris. (Plaintiff's exhibit 1-O.) Noble was examined by Dr. Harris on February 16, 1995. Dr. Harris thereafter mailed the following report to the U.S. Department of Labor:

This letters [sic] is in reply to your request for a medical report on Ottie Noble.

This patient was seen by me on 2/16/95. He stated that in January of 1994 he was in a self defense class and injured his neck which resulted in his having pain in his neck, with numbness and tingling down the right upper extremity. This has persisted since then. He has had evaluation including two myelograms. There was evidence of impaired feeling consistent with disc rupture, cervical on the right at C5 and on the left at C7. These studies were reviewed by our radiologist with me at St. Vincent's Hospital. A complete cervical myelogram was done on 1/30/95. There are defects at C5-6 and C6-7.

It is unfortunate that this patient did not have a computed tomographic study following these myelograms. We would have had a much better idea as to the defects in these areas.

9

On the basis of these studies, due to the poor quality of the studies <u>I cannot make a recommendation that I agree with this man having surgery</u>. He needs to have a high quality myelogram and post myelogram CT done.

I will try to answer the questions that you pose. The answer to question one is that he probably does have a cervical disc rupture. I would casually [sic] relate this to the injury of January 27, 1994. The factors for that are the patient's history of the injury, his history of no previous difficulties, and his subsequent history following the injury. As I previously stated, there is nothing preexisting about this. There is a causal relationship between his disability and his work related accident.

<u>It is my recommendation that this patient have better studies before a final decision is made</u>.

(Plaintiff's exhibit 2-D at 2-3 (emphasis supplied).)

OWCP authorized Dr. Harris to perform the "high quality myelogram and post myelogram CT" on April 10, 1995. (*Id.* at 18.) Noble apparently opposed submitting to those procedures, however, because an April 14, 1995 letter from the OWCP to Dr. Harris records:

Mr. Noble has indicated that he does not want to undergo a third myelogram. Mr. Noble, through Congressman Bevill's office, has been advised that we can not force him to undergo the myelogram. However, since the myelogram is needed so that you may provide your opinion regarding surgery, payment for surgery may not be authorized. Is it possible for you to provide an opinion regarding surgery based on the current evidence? If so, and you feel another evaluation is required, or other non-evasive testing is required, this letter will serve as authorization to do so.

(*Id.* at 17.) Dr. Harris did not respond to that inquiry.[5]

---

[5]If he did respond, a copy has not been provided this court.

10

## D.   Fourth Opinion

For reasons that are not reflected in the record, Dr. Harris referred Noble to Dr. J. Finley McRae, Jr., a neurosurgeon, who conducted an examination on May 3, 1995. (Plaintiff's exhibit 2-B at 10.)   Based on that examination and Noble's prior myelograms, Dr. McRae found:

> The patient may well have cervical root compression and right ulnar neuropathy.   He needs adequate cervical myelogram and CAT scan and nerve conduction studies to answer definitely.  Will obtain a cervical myelogram and CT scan and also NCV of both upper extremities.

(Id.)   Noble consented to those procedures, and they were conducted on May 15, 1995.    The cervical myelogram revealed

> right and left sided defects seen at two levels.  CT scan of the cervical spine post myelography revealed a small ventral defect at C5-6 with osteophyte and small left sided defect at C6-7 with slight compression.   EMG and nerve conduction studies of the right upper extremity were normal.  He tolerated myelography well and had no problems following the procedure.

> Patient was discharged on 5/16/95, ambulatory and afebrile, well hydrated, given instructions in activity along with precautions post myelography.  He will avoid strenuous activity, force fluids for another 24 hours, and he was given no medications at the time of discharge. He will call the office to discuss the findings at CT scanning and further treatment.

> FINAL DIAGNOSIS: Neck and right arm pain.

> PROCEDURE: Cervical myelogram.

(Id. at 4.)   Dr. McRae's records cease on May 15, 1995, and there is no indication that he recommended surgery.

11

Even so, notes made by Dr. White after a May 24, 1995 examination of Noble are instructive:

> 05/24/95: Return visit. Apparently he has been sent for another opinion by the company to Dr. McRae. According to the patient, and again I have no records from Dr. McRae, Dr. McRae told him that all of the x-rays he had done at our hospital was sub-quality and had to all be repeated.  So for whatever reason, he had all of the diagnostic testing repeated including myelography which had been done very recently.  Obviously, Dr. McRae has not communicated with me directly.  According to Mr. Noble, Dr. McRae has told him he does have two abnormal discs but does not recommend surgery and to go back to his regular activities. He says that he was also told by a nurse in his office that she would not let me touch anybody from their company.  Of course, an opinion is just an opinion.  Obviously the patient is very upset. I am very thick skinned and it does not particularly bother me.  I think the patient should do whatever he is most comfortable with.  I would take exception with the statement that our work is of poor quality and I will so note this.   I will have my Workmen's Comp workers investigate this allegation.

(Plaintiff's exhibit 2-C at 4 (emphasis supplied).)  Dr. White was able to review Dr. McRae's records during a follow-up visit on June 7, 1995:

> 06/07/95: Return visit.  Indeed, in Dr. McRae's notes it states that the films were not adequate.  I suppose this speaks for itself.  He chose to repeat testing just done. Actually I have reviewed their myelogram films performed there.  They are so dark and perhaps are copies, they are almost unreadable.   I do think he had a very good CAT Scan.  It is interesting to note that the CAT scan report post myelogram that they performed was quite abnormal. At any rate, Mr. Noble has conflicted opinions.  I have told him that he can certainly get another opinion if he wishes.   My hands are a bit tied right now.   I have offered a possible treatment.   Apparently no other treatment or therapy has been offered.  I am releasing him at this time to return as needed.

(Id. at 3.)

12

## E.   Fifth Opinion

Noble personally sought another opinion from Dr. Terry Andrade, a neurosurgeon, on June 15, 1995. (Plaintiff's exhibit 2-F at 25-26.)   Following physical examination and a review of Noble's prior myelograms, Dr. Andrade recorded:

> I strongly recommend anterior cervical discectomy and fusion, C4-5 and C7 with bone bank bone and Orion Plate Instrumentation.  It is my opinion that this work related injury could be solved with surgical decompression as he has been told on several occasions in the past.   The longer that he goes before surgical treatment, the more likely it is that he will have a permanent disability with residual radiculopathy secondary to his work related injury.  It is also my opinion that following surgical decompression, that he should be able to return to work in 8-12 weeks without limitation.

(*Id.* at 26.)   Dr. Andrade forwarded "Attending Physician's Supplemental Reports" with those findings to the OWCP on July 13 and October 26, 1995.  (*Id.* at 22, 23.)

## F.   Surgery Authorized

The OWCP approved surgery on January 3, 1996. (Plaintiff's exhibit 1-B.)   Dr. Andrade performed the procedure on January 26, 1996.   (Plaintiff's exhibit 2-F at 13-15.)   The surgery proved unavailing:  Noble continued to complain of pain and discomfort in his neck and arms.  (*Id.* at 4-5.)   Dr. Andrade's final record of April 9, 1996 states that plaintiff reported a "dull ache" in his right arm and shoulder, as well as occasional neck discomfort. (*Id.* at 1.)   Dr. Andrade found a "decrease of the muscle bulk of

13

the right upper extremity as compared to the left," but also found Noble was "progressively improving." (*Id.*)

## II.   DISCUSSION

### A.   Administrative Prerequisite to Federal Tort Claims Action

The Supreme Court of the United States holds that a district court does not have jurisdiction to consider tort claims against the United States unless the plaintiff has first filed an administrative claim with the concerned agency pursuant to 28 U.S.C. § 2675(a) of the Act, **and**, that claim has been finally denied or deemed denied by operation of law.[6]   *McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *see also Lykins v. Pointer, Inc.*, 725 F.2d 645, 646-47 (11th Cir. 1984).

The requirement of filing an administrative claim is a jurisdictional prerequisite to suit and cannot be waived. *Brown v. United States*, 838 F.2d 1157, 1163 (11th Cir. 1988); *Gregory v. Mitchell*, 634 F.2d 199, 203-04 (5th Cir. 1981).[7]   Noble presumably

---

[6]28 U.S.C. § 2675(a) provides in pertinent part:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.   The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

attempts to meet that requirement with the following paragraph of his complaint:

> In August 1996, prior to the commencement of this action, plaintiff filed a claim with the following persons and/or entities seeking a resolution of this matter:
>
> U.S. Bureau of Prisons
> Kathleen Hawk, Director of Bureau of Prisons;
> Office of Worker Compensation Programs;
> Robert Reich, Secretary of Labor;
> Hon. Janet Reno.; Attorney General of the USA.

(Complaint at 9.) That paragraph fails to assert either that the claim was finally denied or deemed denied by operation of law. Even so, if Noble filed an administrative claim in "August 1996" and subsequently filed the present action on September 18, 1997, more than six months would have passed and the administrative complaint would be deemed denied by operation of law. Thus, Noble's complaint is sufficient to satisfy the administrative prerequisites to a Federal Tort Claims Act action under the liberal pleading requirements of Rule 8, *Fed.R.Civ.P.*, even though it would have been better practice to specifically allege all jurisdictional prerequisites.

**B.   Is Plaintiff's Claim the Subject of the Federal Employees' Compensation Act?**

The Federal Employees' Compensation Act (FECA) provides the exclusive remedy for federal employees injured in the performance of their duties:

> The liability of the United States or an instrumentality thereof under this subchapter or any

15

> extension thereof with respect to the injury or death of
> an employee is exclusive and instead of all other
> liability of the United States or the instrumentality to
> the employee, his legal representative, spouse,
> dependents, next of kin, and any other person otherwise
> entitled to recover damages from the United States or the
> instrumentality because of the injury or death in a
> direct judicial proceeding, in a civil action, or in
> admiralty, or by an administrative or judicial proceeding
> under a workmen's compensation statute or under a Federal
> tort liability statute. However, this subsection does
> not apply to a master or a member of a crew of a vessel.

5 U.S.C. § 8116(c). Before FECA's exclusive remedy provision can
be enforced, however, the Secretary of Labor must determine that
the FECA covers the injuries in question. *See Woodruff v. United
States,* 954 F.2d 634, 639 (11th Cir. 1992)("After the Secretary
makes a determination to award benefits, the injured employee's
exclusive remedy is to accept FECA coverage").

Plaintiff claims he is not seeking to recover under the FECA
for "personal injury sustained while in the performance of his
duty...." *See* 5 U.S.C. § 8102(a). Instead, he seeks damages under
the FTCA for aggravation of those injuries, which "occurred many
months *after* the on-the-job injury." (Plaintiff's brief at 1
(emphasis in original).) Thus, the issue in this action is whether
aggravation of Noble's injuries by the alleged negligent acts of
government-employed claims examiners is covered by the FECA.

1. **Determination of FECA coverage by the Secretary of Labor**

The determination of FECA coverage is left to the Secretary of
Labor. *See* 5 U.S.C. § 8145 ("The Secretary of Labor shall
administer, and decide all questions arising under, this

16

subchapter"); *Woodruff v. United States*, 954 F.2d 634, 639 (11th

Cir. 1992). Once the Secretary has determined that an injury is

within FECA's coverage, this court may not review any decision to

allow or deny payments to Noble:

> (b) The action of the Secretary or his designee in allowing or denying a payment under this subchapter is —
>
> > (1) final and conclusive for all purposes with respect to questions of law and fact; and
> >
> > (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

5 U.S.C. § 8128(b) (emphasis supplied).

It must be stressed that the Secretary's determination of

coverage is distinct from a determination of compensability,

however.

> If the Secretary determines the employee was injured in the performance of duty, the Secretary's decision is binding on the court, regardless of whether compensation is actually awarded, and the court action must be dismissed. *See* [*McDaniel v. United States*, 970 F.2d 194, 198 (6th Cir. 1992)]; *see also* 5 U.S.C. § 8128(b). If the Secretary determines the injury did not occur in the performance of duty, FECA does not preempt the court action and the employee may proceed under the FTCA. *McDaniel*, 970 F.2d at 198.

*Tarver v. United States*, 25 F.3d 900, 903 (10th Cir. 1994).

### 2. Is there a Substantial Question of FECA Coverage?

If the Secretary of Labor has not decided FECA's applicability

to the aggravation of Noble's injuries, this court only may

consider his claims if there is no "substantial question of

coverage under the Federal Employees' Compensation Act." *See*

17

*Bailey v. United States*, 451 F.2d 963, 965 (5th Cir. 1971)("if no substantial question of FECA coverage is presented, the employee may prosecute his tort claim without first applying to the Secretary of Labor"). Precedent demonstrates that a "substantial question" exists, however. *See Wilder v. United States*, 873 F.2d 285 (11th Cir. 1989).

*Wilder* was decided under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901-950: a statute whose exclusivity provision

> is identical in all material respects of its sister provision, 5 U.S.C.A. § 8116(c)(1980), which purports to make exclusive the liability of the United States and its instrumentalities under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C.A. §§ 8101-93 (1980).

*Wilder*, 873 F.2d at 287. The plaintiff in *Wilder* injured her back in the performance of her duties at Moody Air Force Base in Valdosta, Georgia. She "made a number of trips" to the base hospital following her injury, and was hospitalized for a period of one week. Upon her discharge from the base hospital, a civilian neurosurgeon diagnosed a herniated disc and performed two surgeries to treat the condition.

Thereafter, the plaintiff commenced an action under the Federal Tort Claims Act alleging "that medical personnel at the hospital were negligent in failing to diagnose her condition, in administering treatment which was both inadequate and harmful, and in failing to consult with a qualified specialist, all of which

18

aggravated her condition and contributed to her subsequent permanent disability." *Id.* (emphasis supplied). The district court found the plaintiff's exclusive remedy was under the FECA's "sister statute," the Longshore and Harbor Workers' Compensation Act, and dismissed her complaint with prejudice.

The Eleventh Circuit characterized "[t]he discrete issue presented [as] whether the subsequent aggravation of [plaintiff's] injury by the alleged malpractice of the hospital's medical personnel presents a substantial question of coverage under the LHWCA." *Id.* at 288. The court noted that several cases "suggest that if a work-related injury compensable under FECA is aggravated through medical treatment, the aggravation is also compensable." *Id.* (citing *Baker v. Barber*, 673 F.2d 147, 150 (6th Cir. 1982); *Balancio v. United States*, 267 F.2d 135, 137 (2d Cir. 1959); *Mohr v. United States*, 184 F.Supp. 80, 81 (N.D. Cal. 1960); *Frieouf v. United States*, 183 F.Supp. 439, 440 (N.D. Cal. 1960)). The court also found persuasive the following reasoning of the Second Circuit:

> It is not necessary, we think, to hold that it was part of the plaintiff's duty to go to the hospital, because the aggravation of his initial injuries, suffered while he was indubitably in performance of his duty, should be regarded as resulting from the initial injuries themselves. As we have just said, that is the rule at common-law when the claim is for negligence; the initial wrong is the cause of all that follows, even when there has intervened a succeeding negligent act that produced the aggravation. We interpret the Compensation Act as a substitute for the whole of the claim that, but for it, would have arisen under the Tort Claims Act.

19

*Id.* (quoting *Balancio v. United States*, 267 F.2d 135, 137 (2d Cir.

1959) (emphasis supplied).  Thus, the court held:

> that the aggravation of her work-related injuries through
> the alleged malpractice of treating medical personnel
> presents a substantial question of coverage under the
> LHWCA, and a more conclusive determination is
> unnecessary.  The district court erred in finally
> determining that the aggravation of Wilder's work-related
> injury was compensable under the LHWCA; in our opinion,
> that determination should be made in the first instance
> by the Secretary.  Until Wilder has made an application
> for benefits and had it denied, she cannot pursue her
> remedy under the FTCA.

*Id.* (emphasis supplied).

Ottie Noble's case is analogous to *Wilder*: the aggravation of

his work-related injuries through the alleged negligent acts of

government-employed claims examiners presents a substantial

question of coverage under the FECA.  *Wilder* suggests that the

"correct approach" in such a situation "is to dismiss [Noble's]

complaint without prejudice to [his] right to file another upon an

allegation that [he] has been denied benefits under the [FECA]."

*Id.* at 289.

Even so, the *Wilder* court was not presented with statute of

limitations issues which may plague plaintiff:  this action is over

fours years removed from Noble's initial injury, and more than

three years distant from Dr. White's first recommendation of

surgery.  Indeed, the government has already raised the FTCA's two

year statute of limitations against plaintiff's injuries suffered

before August of 1994.[8] (Defendant's brief submitted December 4, 1997 at 15.) If this action were dismissed and refiled at a later date, the government would undoubtedly argue that a new administrative claim is required, and a later statute of limitations is applicable.

When such issues are presented, binding precedent requires this court to hold the action in abeyance pending a determination by the Secretary of Labor. In *Concordia v. United States Postal Service*, 581 F.2d 439 (5th Cir. 1978), the Fifth Circuit was presented with a substantial question of coverage under the FECA. The court modified the district court's order dismissing with prejudice, and held the action in abeyance pending the Secretary of Labor's determination.

> If the Secretary does elect to consider the claim and determines that the FECA provides the exclusive remedy for this injury, appellant must pursue that claim accordingly. If, however, the Secretary finds no FECA coverage, appellant will be free to proceed under the FTCA. We cannot predict how long that administrative process will take. In the meantime, the two-year statute of limitations may have run, raising serious questions regarding whether the Court could grant any relief. To avoid that problem we think that the District Court should merely have held the cause in abeyance pending the Secretary's determination of FECA coverage.

---

[8]      (b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). Plaintiff alleges he filed an administrative claim in "August 1996." (Complaint at 9.) Thus, the government contends any injury occurring before August 1994 is time-barred.

*Id.* at 444; *see also Tarver v. United States*, 25 F.3d 900, 902 (10th Cir. 1994)("the court must stay its proceedings pending the final decision of the Secretary of Labor regarding FECA coverage"); *McDaniel v. United States*, 970 F.2d 194, 198 (6th Cir. 1992)("the courts will stay proceedings pending the final decision of the Secretary").

C.   **Conclusion**

This court strongly suspects that no determination has been made by the Secretary of Labor on FECA coverage for aggravation of Ottie Noble's injuries. Even so, Noble's pleadings and brief are equivocal on that point. He simply alleged he had "filed a claim" with the Bureau of Prison's "Office of Worker Compensation Programs" and "Robert Reich, Secretary of Labor" (Complaint at 9), but he fails to allege whether that filing was an administrative claim (as a prerequisite to an FTCA action) or a FECA claim. Accordingly, plaintiff's counsel shall supply copies of those "claims" to this court within seven days.

Three possible solutions may arise after the submission of those materials.

1.   Plaintiff's August 1996 "claim" was one for FECA benefits pertaining to the aggravation of his injuries, and the Secretary of Labor determined there was no FECA coverage for that claim.   This court accordingly will review Noble's claim for FTCA liability.   *See Concordia v. United States Postal Service*, 581 F.2d 439, 444 (5th Cir. 1978)("If, however, the Secretary finds no FECA coverage, appellant will be free to proceed under the FTCA").

22

2.  Plaintiff's August 1996 "claim" was one for FECA benefits pertaining to the aggravation of his injuries, and the Secretary of Labor determined there was FECA coverage for that claim.  This court will not review any decision of the Secretary, and will dismiss Noble's case with prejudice.  *See* 5 U.S.C. § 8128 (b).

3.  Plaintiff's August 1996 "claim" was an administrative prerequisite to his FTCA action.  This court will hold the action in abeyance pending a determination by the Secretary on FECA coverage.  *See Concordia*, 581 F.2d at 444; *Wilder*, 873 F.2d at 288.

Accordingly, this court finds that defendant's motions will be held in abeyance, pending submission of the foregoing materials by plaintiff's counsel.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

**DONE** this the _3rd_ day of March, 1998.

United States District Judge

23